**Ruben GUEVARA, et al.,
Plaintiffs, Appellees,**

**v.**

**DORSEY LABORATORIES, DIVISION
OF SANDOZ, INC., Defendant,
Appellant.**

**Ruben GUEVARA, et al.,
Plaintiffs, Appellants,**

**v.**

**DORSEY LABORATORIES, DIVISION
of SANDOZ, INC., Defendant, Appellee.**

**Nos. 87–1431, 87–1519.**

United States Court of Appeals,
First Circuit.

Heard Dec. 10, 1987.

Decided April 26, 1988.

As Amended May 4, 1988.

---

David Efron, Rio Piedras, P.R., with whom Rolando A. Silva, San Juan, P.R., was on briefs, for plaintiffs.

Jose L. Gandara with whom Bauza & Davila, Old San Juan, P.R., was on briefs, for defendant.

Before COFFIN, BREYER and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

Defendant below appeals from a jury finding of liability and damages in this diversity action. The suit is against a drug manufacturer, Dorsey, for failure to adequately warn doctors of dangers associated with the use of its drug. The main issue on appeal is whether there was sufficient evidence to sustain findings of inadequate warning and causation. We find that there was not sufficient evidence, and reverse.

According to her allegations, in early 1980, plaintiff Elba Colón was treated for injuries received in the course of her employment. As part of the treatment, a Dr. Boria apparently prescribed Bellergal-S, a prescription drug manufactured by the defendant. Colón took the drug for a total of five days. After three days, however, she began to experience a skin rash that caused blisters to break out on her body. These blisters became infected, smelled badly for about five months, and left scars and hyperpygmented (dark) spots on her body that are apparently permanent. She claims that the rash was the result of an allergic reaction to phenobarbital, one of the main ingredients in Bellergal-S.

Colón then brought this action in federal court pursuant to its diversity jurisdiction. She claimed under the law of Puerto Rico that Dorsey had a duty to warn adequately of dangers inherent in the use of this drug, that it failed to do so, and that Dorsey's failure to warn adequately was the proximate cause of her injury. We must now evaluate whether the evidence introduced at trial, taken in the light most favorable to the plaintiff, and with all reasonable inferences drawn in her favor, supports the jury's finding. *Valedón–Martinez v. Hospital Presbiteriano*, 806 F.2d 1128, 1134 (1st Cir.1986).

The relevant law in this case is the law of Puerto Rico. Specifically, 31 L.P.R.A. § 5141 (1956) makes persons responsible for the damage caused by their negligence. Under this section, the Supreme Court of Puerto Rico has developed a strict liability standard for manufacturers of defective products. *See, e.g., Mendoza v. Cerveceria Corona*, 97 D.P.R. 499 (1969); *Montero Saldana v. American Motors Corp.*, 107 D.P.R. 452 (1978). While the court rejected the "unreasonably dangerous" requirement included in the Restatement (Second) of Torts § 402A, in terms of the basic theory, these cases seem to track decisions in the United States making manufacturers responsible, regardless of fault, when a defective product they produced causes a harm.

An important treatise on extra-contractual damages in the law of Puerto Rico concludes that, despite a traditional negligence requirement, most civil law systems as well as the Supreme Court of Puerto Rico have been achieving results very similar to strict liability in these cases. By means of various theories and legal fictions, it claims, the Civil law countries have approximated

the results achieved under the anglo-american theory of strict liability, embodied in the Restatement (Second) of Torts § 402A. *See* 2 H. Brau del Toro, *Danos y Perjuicios Extracontractuales en Puerto Rico,* § 16.04–05, pp. 906–18 (2d Ed. 1986).

On the precise issue before us, however, the parties have not directed us to any relevant authority in the Civil Law proper. Nor, after a diligent search, have we found authority in Puerto Rico or the civilist tradition to define what constitutes adequate warning in cases such as this one. The Supreme Court of Puerto Rico has made clear that the common law of the United States is not controlling, when filling gaps in the civil law system. *Valle v. American International Insurance Co.,* 108 D.P.R. 692, 696–97 (1979). At the same time, however, when faced with a lack of authority, it may be appropriate to search for relevant principles in the common law. *Id.* Since the Supreme Court has freely taken from common law decisions in developing the concept of strict liability, *see Mendoza,* 97 D.P.R. 499; *Montero–Saldana,* 107 D.P.R. 452, and since the principles we find there are useful and persuasive, we believe the Supreme Court of Puerto Rico would follow essentially the same path we follow today.

We turn, therefore, to an analysis of relevant cases and doctrines from the United States. It is generally accepted, and the parties do not contest, that a prescription drug manufacturer has a duty to adequately warn prescribing physicians of the hazards posed by the use of its drugs. *Pierluisi v. E.R. Squibb & Sons,* 440 F.Supp. 691 (D.P.R.1977). The warning is directed not to the ultimate user but to the doctor prescribing the drug, who must then "take into account the propensities of the drug and the susceptibilities of the patient and make an informed decision" regarding the advisability of its use. *Dalke v. Upjohn,* 555 F.2d 245, 248 (9th Cir.1977) (applying Restatement (Second) Torts § 402A). The warnings, in effect, cure the product of any defect for purposes of strict liability.

Comment j of § 402A aptly describes Dorsey's responsibility in this case:

The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger.

■ The evidence below clearly establishes that Dorsey knew that phenobarbital, and in consequence, Bellergal-S, could cause an allergic reaction in certain persons. From the evidence, the jury could have concluded that the number of these persons was substantial enough that Dorsey had a duty to warn doctors of the possibility of this allergic reaction.

Dorsey, however, unquestionably did warn of this hazard. Both the Physician's Desk Reference and the package insert that comes with the drug warned physicians not to give the drug to persons with "a demonstrated hypersensitivity to any of its components." Since phenobarbital is prominently and repeatedly said to be one of the main ingredients, the warning, read as a whole, clearly tells doctors not to administer Bellergal-S to patients known to be allergic to phenobarbital.

■ Plaintiff's theory goes further, however. Colón argues that the jury was entitled to determine that the warning was inadequate because it did not specifically warn of the *kind* of reaction she experienced, that is, a dermal reaction, causing the skin rash and the permanent dark spots all over certain parts of her body. The evidence in this case, however, does not warrant requiring such a detailed admonition, in light of the testimony of plaintiffs' own expert witness that the danger was

already well known to the medical community.

■ The duty to warn in general is limited to hazards not commonly known to the relevant public. *See* § 402A, Comment j, quoted above (need to warn only if "the ingredient is one whose danger is not generally known"). Section 388 of the Restatement, in a slightly different context, reflects the same principle: one who supplies another with a chattel is under a duty to inform of its dangerous character insofar as he is aware of it, "if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved." Restatement (Second) of Torts, § 388, Comment on clause (b). The courts have recognized this principle in their description of the scope of a drug manufacturer's duty to warn: "The warning should be *sufficient to apprise a general practitioner* as well as the 'unusually sophisticated medical man' of the dangerous propensities of the drug." *McEwen v. Ortho Pharmaceutical Corp.*, 270 Or. 375, 528 P.2d 522, 529 (1974) (quoting *Parke-Davis & Co. v. Stromsodt*, 411 F.2d 1390, 1400 (8th Cir.1969)) (emphasis added).

The Ninth Circuit, relying on § 402A, has spoken persuasively on the specific question at issue here:

"It is not the knowledge actually possessed by the plaintiff, individually [or, in this case, plaintiff's doctor], that determines whether the absence of warning renders a product unreasonably dangerous.... On the issue of duty to warn ... the question to be put to the jury is whether 'the danger, or potentiality of danger, is *generally* known and recognized'; whether the product as sold was 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it [again, in the case of prescription drugs, the general practitioner who prescribes it], with *the ordinary knowledge common to the community* as to its characteristics.' "

*Jackson v. Coast Paint and Lacquer Company*, 499 F.2d 809 (9th Cir.1974) (quoting § 402A, Comments i and j) (emphasis in original).

■ We do not know, because neither party thought to call her as a witness, the extent of the treating doctor's knowledge of the allergenic properties of phenobarbital. Evidence of that nature would go to intervening superseding cause arguments, *see Mulder v. Parke-Davis & Co.*, 288 Minn. 332, 181 N.W.2d 882 (1970), or similar problems of causation (*i.e.*, if the doctor knew of the danger already, the failure to warn could not have been the cause of the injury). But that is not quite the issue here. We are now reviewing the *adequacy* of the warning, and that is measured against the general level of knowledge existent in the target community. If the warning should suffice to alert the general practitioner as well as the specialist, it is adequate, and the manufacturer is not liable for the injuries caused by the drug.

In this case the only evidence available to the jury stating that the warning was inadequate, was the testimony of plaintiff's expert. That testimony in fact, however, indicates that the warning actually provided *was* sufficient to alert a general practitioner with the ordinary knowledge common to the medical community, that phenobarbital could cause a dermal reaction [1] in a susceptible person. The plaintiff's expert witness, a doctor specializing in dermatology, baldly stated that the warning was inadequate. He also, however, testified that it is common knowledge in the medical profession that phenobarbital can cause an allergic reaction:

Q But you know that for Bellergal there is a common reaction, allergic reaction?

A Because of the phenobarbital, yes.

Q So, phenobarbital is a common element in causing allergic type reactions?

---

1. We speak of a dermal reaction in general and not of the permanent hyperpygmentation apparently suffered by Mrs. Colón, because there is no evidence of any prior incident in which a reaction to Bellergal-S caused such a permanent result, nor evidence that Dorsey could have anticipated that result.

A  Yes.

Q  And you know that?

A  Yes.

Q  So, you know that because you have done some kind of research or some kind of particular investigation?

A  No, I haven't done any but I have read and I have seen a lot of clinical cases.

Q  And you have seen and you have read, is this something that you feel that other people may have read?

A  Yes.

Q  Okay.  Could I say that this then is what you are telling us, that you know we may think that is common knowledge to the medical profession?

A  Yes, should be.

And again later, the doctor testified:

Q  Okay.  Now, you said—then we can say that you saw that this lady has a typical allergic reaction to medication which is a common thing?

A  Yes, very common.

On redirect, plaintiff's attorney attempted to repair the damage, but the doctor reaffirmed when pressed by the magistrate, that "[i]t should [be known to the general medical profession], but the ones that are more aware is [sic] dermatologists because we see this all the time."  If we may reverse the doctor's phrases, his testimony was that the specialists are especially aware, as they should be, but general practitioners also should know of these reactions.

In addition, the doctor testified that a dermal reaction is a common one in a drug-related allergy.  He was even more specific than that:  he indicated that a doctor warned about hypersensitivity should know that it could be manifested as a skin rash.

A  Well, the reaction, most of the people don't know what hypersensitivity is, but it's a skin rash.

Q  But physicians know?

A  Should know.

Q  And Dr. [Boria, the prescribing doctor,] should have known?

A  Should.

In addition, he said, this allergy can be manifested in any one of a large variety of ways.

Q  ... Does phenobarbital cause other kinds of reactive reactions?

A  Yes, could cause almost anything; dizzy spells and constipation, many other things.

So we have the uncontradicted testimony of plaintiff's own expert, saying that an allergy to phenobarbital can "cause almost anything," and that all doctors should know that a skin rash is one of those things.  It is quite clear, therefore, that the evidence in this case warrants only this conclusion relating to the state of knowledge common to the medical profession regarding phenobarbital:  doctors should know that phenobarbital can cause a dermal reaction.

The expert also repeatedly stated that every doctor and druggist should warn a patient about possible adverse reactions to any drug.  (Appendix, 128).  Speaking of Bellergal specifically, and given the fact "that this is common knowledge to all doctors," he said that he would always warn a patient about a possible allergic reaction to phenobarbital.  (A. 138).  Finally, he made clear that he would give the warning even if he had not seen a Bellergal insert or the warning in the Physician's Desk Reference.  (A. 150).  In light of all these statements we find inherently incredible, at least as far as allergic reactions to phenobarbital are concerned, his later broad statement that "normal" physicians would not be expected to give any warning not found in those two earlier mentioned sources (A. 156), with the implication that the same would be true of the specific warning at issue in this case.

We conclude, therefore, as a matter of law, that apprising physicians of the existence of phenobarbital in Bellergal-S, and cautioning them not to prescribe Bellergal-S to persons allergic to phenobarbital *is* adequate, given the level of knowledge in the medical community as explained by the expert, to put doctors on notice that a skin rash, such as that suffered by plaintiff Colón, could occur as a result of the in-

gestion of Bellergal-S.[2]

Furthermore, we do not find any merit in plaintiffs' cross-appeal from the district court's denial of attorney's fees under P.R. Rules of Civ.P. 44.1. None of plaintiffs' allegations have convinced us that defendant's actions and attitude were so outrageous as to warrant reversing the district court's thrice-considered denial of attorney's fees. This is, after all, a decision that "rests heavily on the discretion of the district court," *Marston v. American Employers' Insurance Co.*, 439 F.2d 1035, 1042 (1st Cir.1971), and we have seen nothing on appeal that warrants a finding of abuse of discretion.[3]

■ At the same time, given the several instances of delay attributed to the defendant, and the fact that the district court at one point even granted a default judgment, we cannot say that the cross-appeal was completely frivolous. We therefore also deny defendant's petition for damages for a frivolous appeal under Rule 38 of the Federal Rules of Appellate Procedure.

We, therefore, *reverse* the district court's denial of defendant's motion for judgment notwithstanding the verdict, and *affirm* its denial of attorney's fees and costs to plaintiffs. *Remanded* for entry of judgment consistent with this opinion.

COFFIN, Circuit Judge, dissenting.

My colleagues set aside a jury verdict on the assumption that the testimony of plaintiffs' own expert witness, Dr. Silva, reveals conclusively that the danger of a dermal reaction was already well known to the medical community. This being so, they conclude that defendant's warning was not defective in failing to specify the possibility of this reaction.

My dissent is based on the simple observation that Dr. Silva's testimony on direct, cross, and redirect lends itself to opposite conclusions so that it was the jury's province to decide what version to accept. Here is the distillation of his testimony:

*Direct*

Q ... Do you feel that the warning included in the literature of Bellergal Sp, which you have read, and you have read to the jury, is adequate warning to put the prescribing physicians in a position to evaluate the benefits to be derived by the patient, by the use of the drug versus the possible negative dermatological adverse effects that [it] could have on the patient?

A *Definitely not.*

(A. 115; emphasis added.)

*Cross*

Most of the cross examination, including that quoted on pages 8 and 9 of this court's opinion, dealt only with allergic reaction in general, not with knowledge of a possible dermal reaction. (A. 121–122.) That part which embraces knowledge by the medical profession generally of a dermal reaction is the following:

Q ... Okay. Now, you said—then we can say that you saw that this lady has a typical allergic reaction to medication which is a common thing?

A Yes, very common.

(A. 124. Quoted by the court *supra* at 368.)

The cross examination closed with the following exchange between defense counsel and Dr. Silva concerning the warning given by defendant—in the form of an insert accompanying the drug—that Bellergal was "contraindicated in patients who demonstrated hypersensitivity to any of the components of the drug" (A. 144):

Q ... So, this warning should be interpreted by a physician; that is so?

A Well, the reaction, most of the people don't know what hypersensitivity is, but it's a skin rash.

---

2. In view of our resolution of this issue, we need not discuss the challenge to the amount of the jury award.

3. The fact that the district court made no explicit findings of fact, while perhaps unfortunate, does not change the standard of review. This is especially true here, where its decision to deny fees necessarily rests on an implicit finding of no obstinacy. This practice would, of course, be much more objectionable in a case requiring affirmative findings of fact, as when the court grants attorney's fees.

Q But physicians know?

A Should know.

(A. 150. Partially quoted by the court, *supra* at 368.)

Then on redirect, the following exchange, partially referred to by the court *supra* at 368, took place:

Q ... Dr. Silva ... you testified that this adverse reaction, ... specifically the dermatological adverse reaction, was common knowledge to the medical profession, but I'm asking you whether this would be common knowledge to all kinds of doctors, neurologists, pediatricians, et cetera, or would this be knowledge that would reside basically with dermatologists?

A *Basically dermatologists.*

. . . .

THE MAGISTRATE: Are you saying that an adverse reaction to phenobarbital would not be known to the general medical profession, but only to dermatologists?

THE WITNESS: It should, but the ones that are more aware [are] dermatologists because we see this all the time.

THE MAGISTRATE: Because you see the reaction of the skin?

THE WITNESS: Maybe some doctors, they come with a skin rash and they go to the skin doctor.

. . . .

If you take a drug rash from a phenobarbital or from any other drug looks like measles, may look like secondary syphillis, so you don't know if you're not a dermatologist because that's what we are seeing all the time. But they don't know, they should have at least general knowledge.

(A. 152–154; emphasis added.)

Finally, redirect closed with the following exchange, *not* quoted by the court:

Q Do you or does any practicing physician know the contraindications of all of this by heart?

A No, of course not.

---

4. As the court points out *supra* at 366, the Physician's Desk Reference said no more than the package insert accompanying the drug: that the

Q That's what that book is for?

A Yes.

Q If the warning, *the specific warning of a specific adverse reaction is not included in the PDR* [Physician's Desk Reference][4] would you or any *other common normal physician*, practicing physician in Puerto Rico be expected to give a warning if it's not included there?

A *No.*

(A. 156; emphasis added.)

Upon viewing Dr. Silva's testimony in the light most favorable to the plaintiffs, I think there was sufficient evidence for the jury to find that the defendant's warning did not adequately apprise general practicing physicians—like Dr. Boria, the prescribing physician in this case—of possible dermal reactions from Bellargal. I therefore respectfully dissent. I would, however, concur in the court's denial of plaintiffs' cross appeal from denial of attorney's fees.

drug should not be given to persons with a "demonstrated hypersensitivity to any of its components."